## New England Federal Credit Union v. Stewart Title Guarantee Co.

[765 A.2d 450]

No. 98-003

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed February 25, 2000

Motion for Reargument Denied November 15, 2000

*Edward D. Fitzpatrick* and *Daniel P. O'Rourke* of *Bergeron, Paradis, Fitzpatrick & Smith*, Essex Junction, for Plaintiff-Appellant.

*Marikate E. Kelley* and *Guy L. Babb* of *Ward, Kelley & Babb*, South Burlington, for Defendant-Appellee.

**Amestoy, C.J.** New England Federal Credit Union (NEFCU) appeals a summary judgment of the Chittenden Superior Court in favor of Stewart Title Insurance Company on NEFCU's claim for coverage and compensation for losses due to the absence of a required subdivision permit on real property insured by Stewart Title. NEFCU contends the court erroneously concluded that: (1) the failure to obtain a subdivision permit in violation of state public health regulations was not an encumbrance on title covered by the title insurance policy issued by Stewart Title, and (2) coverage was not triggered by the public-records exception to the policy exclusion of encumbrances on title resulting from violations of governmental regulations. We conclude that NEFCU's claims have merit and, therefore, reverse and remand for further proceedings.

The stipulated facts were as follows. By warranty deed, dated July 14, 1976, Alfred and Dorothy Lafrance conveyed a parcel of land in Essex, together with a modular home and a mobile home, to Gordon Reinhart and retained a parcel of land less than ten acres in area. Because the retained parcel was less than ten acres, Alfred Lafrance obtained a deferral of permit on the property from the Vermont Department of Environmental Conservation. The permit prohibited the construction or erection of a structure or building "the useful occupancy of which will require the installation of plumbing and sewage treatment facilities" without first complying with Vermont's subdivision regulations. There is no evidence that the deferral of permit was recorded in the Town of Essex land records.

In August 1986, by warranty deed, the Lafrances conveyed the retained parcel of property to Eugenia Evans. The property tax return for the August 1986 conveyance indicated that the primary use of the property prior to the transfer was as a primary residence with an existing mobile home. In August 1988, Evans conveyed the property and premises to Edward Fleming. The resulting property transfer tax return indicated that the primary use of the property prior to the transfer was as a primary residence.

In 1989, Fleming obtained a building permit from the Town of Essex to replace a mobile home that was located on the lot with a two-story house. In July 1991, NEFCU extended a $67,000 loan to Fleming in connection with the refinancing of the subject land and premises. At the same time, Stewart Title, through its agent, issued a title insurance commitment to NEFCU to provide title insurance in the amount of the loan. Subsequently, Stewart Title issued a contract of title insurance. The title insurance contract issued to NEFCU provided, in pertinent part, as follows:

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIP- ULATIONS, STEWART TITLE GUARANTY COMPANY . . . insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of: . . .
2. Any defect in or lien or encumbrance on the title . . . .

The policy excluded loss, damage, costs, attorneys' fees or expenses which arise by reason of:

Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land . . . (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, *except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.*[1]

(Emphasis added.)

In 1992, Fleming died, and his estate contracted to sell the property for $94,000. The sale fell through, however, upon the buyer's discovery of the violation of the deferral of permit resulting from the erection during the late 1970's of a dwelling and wastewater system on the property without a subdivision permit.[2] NEFCU subsequently foreclosed on the property and sold it at a decreased value of $10,734. NEFCU forwarded a notice of claim to Stewart Title. Stewart Title denied NEFCU's request for coverage and compensation under the policy.

NEFCU filed a complaint for declaratory judgment, after which the parties submitted cross-motions for summary judgment. The trial court denied NEFCU's motion for summary judgment and granted Stewart Title's. The court ruled that the deferral of permit affected the physical use of the land, not title to the land, and therefore was not an encumbrance on title under the policy. The court further ruled

---

[1] The Stewart Title policy's exclusion of land use regulations, and the public-records exception to the exclusion, are not uncommon. Title insurance policies often contain preprinted exclusions from coverage for losses resulting from violations of governmental land use regulations and exercises of the government's police power. See J. Palomar, Title Insurance Law § 6.02 (1998). The reason for the exclusion is because notice of such matters is not routinely recorded in the public records which title insurance companies search prior to issuing a policy. The standard public-records exception to the exclusion was amended in 1987 to include those "records established under state statutes at the date of the issuance of the title policy for the purpose of giving notice of matters relating to real property to purchasers for value and without knowledge." Palomar, *supra*, § 6.02 n.5.

[2] The same property was at issue in *Estate of Fleming v. Nicholson*, 168 Vt. 495, 724 A.2d 1026 (1998). In conducting a title search for Fleming before he purchased the property, Fleming's attorney discovered the violation of the deferral of permit and lack of subdivision permit for the dwelling and wastewater system, but failed to inform Fleming. We affirmed the superior court's decision on Fleming's motion for summary judgment finding the attorney and law firm's omission negligent as a matter of law. *Id.* at 499-500, 724 A.2d at 1029.

that the public-records exception to the exclusion of coverage for governmental regulations was inapplicable because no notice of violation had been recorded in the public land records. This appeal followed.

The standard on appeal for reviewing a summary judgment is the same as that used by the trial court. Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, after giving the benefit of all reasonable doubts and inferences to the nonmoving party. See *Select Design, Ltd. v. Union Mutual Fire Ins. Co.*, 165 Vt. 69, 72, 674 A.2d 798, 800 (1996).

■ NEFCU first contends the trial court erred in ruling that the violation of Vermont's public health regulation requiring a subdivision permit was not an encumbrance on title covered under the policy. In so holding, the court noted that encumbrances generally fall into two categories — those that infringe on the title, and those that involve physical facts concerning the premises. It concluded that the subdivision permit restricted only the use of the land, and therefore was not an encumbrance on title under the policy. The trial court's opinion made no reference to our decision in *Hunter Broadcasting, Inc. v. City of Burlington*, 164 Vt. 391, 670 A.2d 836 (1995), which held that Vermont's public health regulations "*do affect title to the land*," *id.* at 397, 670 A.2d at 840 (emphasis added), because, pursuant to the regulations, the failure to obtain a subdivision permit prohibits the sale of the subject property. We concluded, accordingly, that the city's conveyance by warranty deed of 9.7 acres to Hunter Broadcasting, from a 400 acre lot, without first having obtained state subdivision approval breached the covenant against encumbrances. See *id.* at 394, 670 A.2d at 839.

*Hunter Broadcasting* determined, as a matter of law, that the lack of state subdivision approval constituted a breach of the warranty against encumbrances. Stewart Title rightly emphasizes, however, that this case presents a different question. The issue here is whether a violation of state subdivision regulations represented an encumbrance within the meaning of a title insurance policy. And that issue turns upon the intent of the parties. "Insurance contracts must be interpreted according to their terms and the evident intent of the parties, as gathered from the contract language." *Cooperative Fire Ins. Ass'n v. Gray*, 157 Vt. 380, 383, 599 A.2d 360, 362 (1991); see also *State Farm Mut. Auto. Ins. Co. v. Roberts*, 166 Vt. 452, 460, 697 A.2d 667, 672 (1997). Like most standard title insurance policies, the

Stewart Title policy does not define the terms "defect," "lien," or "encumbrance," and many courts use the terms interchangeably. See J. Palomar, Title Insurance Law § 5.05 (1998). Furthermore, policies and policy language may vary. A closer, contextual examination of the policy is therefore necessary to resolve the issue before us. See *id.*

As noted, the policy excludes from coverage any law regulating the occupancy, use, enjoyment or environmental regulation of land, or the effect of any violation of these laws. An exception to the exclusion, however, provides that coverage will not be denied if "a notice of a defect, lien, or *encumbrance* resulting from a violation or alleged violation affecting the land has been recorded in the public records" at the date of the policy. (Emphasis added.) Thus, read in its entirety, the policy language evinces a clear intent to include violations of land-use regulations within the meaning of "encumbrance," and within the scope of coverage, *to the extent that they had been recorded in the public records on the date of the policy.* See *Roberts*, 166 Vt. at 461, 697 A.2d at 673 (in construing insurance policy, we must consider policy "in its entirety" with an eye toward its overall purpose).[3]

 The question of coverage in this case thus pivots on whether notice of the violation was recorded in the "public records." Turning once again to the policy, we find that it defines "public records" as:

---

[3] We are aware that decisions from other states have reached varying conclusions as to whether land use regulations that restrict the use, occupancy, or enjoyment of land may constitute an encumbrance on title. In *1119 Delaware v. Continental Land Title Co.*, 20 Cal. Rptr. 2d 438, 442-43 (Ct. App. 1993), the court held that a conditional use permit that required at least one occupant of each unit in the subject property to be at least sixty-two years old or physically handicapped was an encumbrance affecting title under the title insurance policy issued by the defendant. In *Hopkins v. Lawyers Title Ins. Corp.*, 514 So. 2d 786, 789 (Ala. 1986), *overruled on other grounds by State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834 (Ala. 1998), the court held that a release agreement between the local municipality and the developer of the subject property regarding liability for floods that had been recorded in the county office of the probate judge was an encumbrance under the title insurance policy issued by the defendant. In *Bear Fritz Land Co. v. Kachemak Bay Title Agency, Inc.*, 920 P.2d 759, 761-62 (Alaska 1996), however, the court held that a federal wetlands permit containing restrictions was not an encumbrance on title under the title insurance policy, and therefore was outside the scope of coverage. There is no indication in that case, however, that the policy at issue contained the specific public-records exception to the land-use exclusion that was contained in Stewart Title's policy. Similarly in *Somerset Savings Bank v. Chicago Title Ins. Co.*, 649 N.E.2d 1123 (Mass. 1995), the court concluded that the absence of a building permit as required by state law did not represent an encumbrance on title. There, however, the subject policy expressly excluded from the definition of public records "any of the offices of federal, state or local environmental protection, zoning, building, health or public safety authorities." *Id.* at 1126. Because policy language varies from case to case, these decisions are of limited value.

records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchaser for value and without knowledge.

Without explanation, the trial court construed this definition to include only matters of record in the "public *land* records." In both *Hunter Broadcasting*, 164 Vt. at 396-97, 670 A.2d at 840, and *Bianchi v. Lorenz*, 166 Vt. 555, 560-61, 701 A.2d 1037, 1040-41 (1997), however, we held that records imparting constructive notice of matters relating to real property are not confined under our statutory scheme solely to documents recorded in the municipal land records.[4] Like the instant case, *Hunter Broadcasting* involved the failure to obtain a subdivision permit in violation of Vermont's public health regulations. At the time of the relevant events in *Hunter Broadcasting*, subdivision permits were not required by statute to be recorded in the land records. See *Bianchi*, 166 Vt. at 560-61 n.2, 701 A.2d at 1040-41 n.2. Nonetheless, we concluded that, because "Vermont's subdivision regulations are sufficiently precise that an ordinary person, using ordinary common sense, can understand and comply with them," the city's violation of the subdivision regulations when it conveyed the 9.7 acre parcel should have been obvious from the very nature of the transaction. *Hunter Broadcasting*, 164 Vt. at 396-97, 670 A.2d at 840. Indeed, although the concurring opinion in *Bianchi* anticipated the difficulties of searching for encumbrances outside of the land records, that concern did not extend to the search necessary to determine whether a state subdivision permit had been obtained or violated. See *Bianchi*, 166 Vt. at 563-64, 701 A.2d at 1042-43 (Allen, C.J., concurring). The concurrence distinguished its concern about searching municipal records from a search of a state agency's records when it explained:

> In *Hunter Broadcasting* the seller knew that a state subdivision permit had not been obtained when it conveyed the property. A subsequent seller could easily verify the existence or nonexistence of the state subdivision permit by

---

[4] *Bianchi* held that an encumbrance on title exists where a search of municipal records would reveal that the subject property was in violation of local zoning requirements because of a failure to obtain a certificate of occupancy, and that such violation substantially impaired the use and enjoyment of the property. 166 Vt. at 556, 701 A.2d at 1038. The Vermont General Assembly subsequently enacted legislation providing, in part, that "no encumbrance on record title to real estate or effect on marketability shall be created: (1) by the failure to obtain any required municipal [land use] permit." 27 V.S.A. § 612. The meaning and effect of this legislation is not before us.

contacting the issuing agency for permits required to be issued before September 1, 1994, or by searching the land records for permits issued after that date.

*Id.* at 564, 701 A.2d at 1042-43.

The lesson of *Hunter Broadcasting* and *Bianchi* is reinforced in the case at bar. As recounted in *Estate of Fleming v. Nicholson*, 168 Vt. 495, 724 A.2d 1026 (1998), the attorney who conducted the title search for Fleming, the purchaser here, readily discovered that the parcel was carved out of a larger piece of land pursuant to a deferral of permit issued by the DEC, and that a dwelling and wastewater system had been constructed on the property without a subdivision permit, in violation of the deferral of permit. See *id.* at 496, 724 A.2d at 1027. Thus, our construction of the policy in question here imposes no additional or unreasonable burdens upon title searchers beyond the normal scope of due diligence.

■ Stewart Title relies on 18 V.S.A. § 1221b, which provides that notice of a subdivision permit violation must be "recorded on the land records of any municipality in which the land subdivision or development is located." While we agree that 18 V.S.A. § 1221b provides a clear directive as to where, precisely, such permits or violations should be recorded, this statute was not in effect at the date of policy, and did not become so until September 1, 1994, approximately three years after Stewart Title issued the policy in question.[5] Therefore, as in *Hunter Broadcasting*, where, at the time of the events in question, subdivision permits were not required by state statute to be recorded in the land records, the public-records exception at issue here plainly encompassed the records of the DEC — a public agency which, pursuant to state law, imparts constructive notice of matters relating to real estate and subdivision permits or violations arising prior to the enactment of § 1221b. See *Bianchi*, 166 Vt. at 560-61 n.2, 701 A.2d at 1040-41 n.2; see generally 1 V.S.A. § 317(b) (defining public records as "all papers, documents, machine readable materials or any other written or recorded matters . . . produced or acquired in the course

---

[5] Subsequent to oral argument, the Legislature passed new legislation addressing the effect of the failure to obtain a state subdivision permit. Where certain conditions are met, the failure to obtain a subdivision permit and the failure to record such permit or comply with the permit regulations shall not constitute a violation that adversely affects the marketability of title. See 18 V.S.A. §§ 1218(d)(1), 1221a(a). Although these statutory changes are not before us, they suggest that, as a practical matter, the significance of our ruling in this case may be substantially limited.

of agency business"); *id.* § 317(a) (establishing DEC as public agency).

Our conclusion finds support outside of Vermont in analogous cases addressing the meaning of public records in the title insurance context. For example, in *Hahn v. Alaska Title Guaranty Co.*, 557 P.2d 143, 145-47 (Alaska 1976), the court concluded that the plain language of the subject title insurance policy did not exclude from the definition of "public records" a public land order filed with the office of the Federal Registrar in Washington, D.C. And in *Radovanov v. Land Title Co. of America*, 545 N.E.2d 351, 355 (Ill. App. Ct. 1989), the court held that a title insurance policy that defined "public records" as those records which by law imparted constructive notice of matters relating to subject land included the records of the circuit court of the county.

Finally, we note that Stewart Title could have readily achieved the more narrow definition of public records that it seeks here simply by excluding from the definition certain locations where public records containing information about matters relating to land are maintained. In *Somerset Savings Bank v. Chicago Title Insurance Co.*, 649 N.E.2d 1123, 1126 (Mass. 1995), the title insurance policy, like the Stewart Title policy, excluded from coverage any encumbrance resulting from a violation of any law or governmental regulation restricting or regulating the use or enjoyment of land unless notice of the encumbrance was recorded "in those records in which under state statutes, deeds, mortgages, lis pendens, liens or other title encumbrances must be recorded in order to impart constructive notice to purchasers of the land . . . ." *Id.* at 1126. Unlike the Stewart Title policy, however, the title insurer in *Somerset* added language explaining that, "*without limitation, such records shall not be construed to include records in any of the offices of federal, state or local environmental protection, zoning, building, health or public safety authorities.*" *Id.* (Emphasis added.) Absent any limiting language such as that in the *Somerset* insurance policy, and prior to the enactment of 18 V.S.A. § 1221b, the policy language here, providing that "records established under state statutes . . . for the purpose of imparting constructive notice of matters relating to real property" plainly includes the deferral of permit at the DEC, a public agency which imparts constructive notice of matters relating to real estate.

■ A final issue concerns the type of notice contemplated by the policy. The trial court concluded in part that because no actual notice of violation or alleged violation was recorded, the exception to the

exclusion did not apply. It is unclear whether the policy requires an actual notice of violation or a notice of a defect, lien or encumbrance filed by the Agency of Natural Resources as a result of a violation or alleged violation. Vermont jurisprudence has consistently affirmed the proposition that, when a disputed term is susceptible to two or more reasonable interpretations, the ambiguity must be resolved in favor of the insured. See *City of Burlington v. Associated Electric & Gas Ins. Servs., Ltd.*, 164 Vt. 218, 221, 669 A.2d 1181, 1183 (1995). The policy itself does not define the term "notice." Its ordinary legal meaning consists of "knowledge of the existence of a fact or state of affairs; the means of knowledge." Black's Law Dictionary 1061 (6th ed. 1990). Stewart Title argues that the article "a" appearing before the word "notice" in the policy required the actual recording of a notice of violation and not several pieces of information which, put together, provided notice. We find, however, a contradiction between that interpretation and the policy's definition of "public records," which describes them as records established under state statute for the "purpose of imparting *constructive notice*" of matters relating to real property. "Constructive notice," as opposed to "a" notice, is "[s]uch notice as is implied or imputed by law, usually on the basis that the information is a part of a public record or file," or "[n]otice with which a person is charged by reason of the notorious nature of the thing to be noticed, as contrasted with actual notice of such thing." *Id.* at 314. Here, the deeds in the chain of title indicated that Fleming's parcel was less than ten acres in size and was a portion of a predecessor in title's larger parcel; this alone should have been an indication to Stewart Title that a subdivision permit was required for the property. See *Hunter Broadcasting*, 164 Vt. at 396-97, 670 A.2d at 840. A search by Stewart Title of the DEC filings would have revealed the deferral of permit prohibiting the construction of a structure on the property that required plumbing and sewage treatment facilities. This notice was sufficient for purposes of the policy.

Stewart Title has asked that, in the event of a reversal, we remand the case to determine whether NEFCU had an insurable interest as of the date of its claim. In its motion for summary judgment, Stewart Title argued that because NEFCU sold the subject property on November 28, 1995 without retaining an estate or interest in the land, and did not forward its claim to Stewart Title until February 15, 1996, the policy coverage was discontinued. Because the trial court granted summary judgment in favor of Stewart Title, it did not reach the issue. Accordingly, we remand for a determination of whether

NEFCU had an insurable interest in the land as of the date of its claim.

*Remanded to determine whether NEFCU had an insurable interest in the subject land as of the date of its claim. Reversed in all other respects.*